# CASES

## IN THE

# SUPREME JUDICIAL COURT

### FOR

## THE COUNTY OF HANCOCK, JUNE TERM, 1831.

---

### SARGENT *vs.* SIMPSON.

The General Court of Massachusetts having appointed a Commissioner to survey the town of *Sullivan,* and report the number of proprietors and settlers of certain classes, their heirs and assigns, and the quantity of land which ought to be confirmed to them; he reported a list of different descriptions of persons, with the number of acres against their names, and among others, " to the heirs of *J. S.* 200 acres"; which report was accepted by the Resolve of *March* 8, 1804, and the several tracts therein mentioned were thereby " confirmed and granted" to the proprietors and settlers, and their heirs and assigns respectively; and the selectmen of *Sullivan* were authorized, upon the payment of a certain small sum by each person entitled, to release to such person, " and to his or their heirs and assigns," the title and interest of the Commonwealth in the land.—*J. S.* had previously deceased, having devised his farm, consisting of the tract above designated, to his wife for life, with remainder to two of his sons. The selectmen made a deed of release to " the heirs of *J. S.*" without other description.

Hereupon it was held,—

That the title of the Commonwealth passed to the proprietors and settlers, by the Resolve, without deed, upon the condition subsequent of payment of the money :—

Sargent *v.* Simpson.

That the resolve enured to the benefit of the assignees and devisees of the proprietors and settlers therein named, who were entitled to deeds from the selectmen ; the word " and" being construed " or," to effectuate the intent of the grant :—

That *J. S.* had an interest in the land, capable of being devised ; and that his devisees were entitled to hold the land, against his heirs at law.

THIS was an action of trespass *quare clausum fregit,* for entering the plaintiff's field in *Sullivan,* and cutting and carrying away his hay, and treading down his potatoes, on the 31st day of *July* 1827 ; and it was tried upon the general issue.

The plaintiff read in evidence the will of *Josiah Simpson,* which was proved *Sept.* 29, 1802 ; in which he devised his homestead to his wife during her life or widowhood ; and afterwards the easterly half, which included the *locus in quo,* to his son *Josiah,* and the other half to his son *James* the defendant, and another son in fee. The whole farm was inventoried as the " homestead farm" of the testator. The easterly half was set off *July* 9, 1814, on an execution against *Josiah Simpson,* the devisee, in favor of certain creditors, who conveyed in *March* 1816, by deed to the plaintiff. It further appeared that the plaintiff occupied the *locus in quo* under a lease from the widow, till her death, which was in *Sept.* 1821 ; after which he continued to hold it under his deed.

The defence set up was that *Josiah Simpson* the testator had no title to the land, but was merely an original settler in *Sullivan ;* and that since his decease the defendant and others, his children and heirs, had acquired the title from the Commonwealth.

To prove this the defendant read in evidence a Resolve of Massachusetts, passed *March* 8, 1804, founded on a report of Gen. *Cobb,* who was appointed to survey the town of *Sullivan,* ascertain the settlers in that town, and run out their lots ; by which report it appeared that *Josiah Simpson,* the testator, was one of those settlers, to whose heirs, as " the heirs of *Josiah Simpson,* deceased, 200 acres" were allotted. The resolve adopted the report, and granted and confirmed the several parcels of land to the persons therein mentioned ; and authorized and directed the selectmen of *Sullivan* to give deeds accordingly. A deed was thereupon made by them, *Sept.* 14, 1804, conveying two hundred acres, including

the homestead farm of the testator, " to the heirs of *Josiah Simpson*," without any other designation.

The plaintiff then read a petition preferred by the defendant to the Judge of Probate for this county, *Nov.* 17, 1824, setting forth that he was seized with others, as an heir, of the real estate, whereof the said testator died seized and possessed, and praying partition of the same ; upon which notice was ordered only to " the heirs of *Josiah Simpson*" ; under which partition was subsequently made of the homestead, as the estate of the testator, among his children ; the *locus in quo* being assigned to the defendant.

Upon this evidence a nonsuit was ordered, by consent, subject to the opinion of the Court upon the right of the plaintiff to maintain this action.

*Greenleaf* for the plaintiff, and *Deane* for the defendant, argued this question at the *June* term, 1831.

MELLEN C. J. delivered the opinion of the Court, at the last term in *Washington*.

By the report of the Judge it appears that soon after the death of *Josiah Simpson*, the testator, which must have been before *Sept.* 29, 1802, the plaintiff entered into possession of the *locus in quo*, and has ever since been in the exclusive occupancy of it. The alleged trespass was committed in the summer of 1827. From his first entry up to the year 1821, he was the tenant of the widow of the testator, who had in his will devised a life estate to her ; and upon her death in that year, he commenced holding the possession in his own right, having in *March* 1816, purchased the land of the creditors of *Josiah Simpson*, one of the sons of the testator, who had extended their execution upon it in *July* 1814, as the property of said *Josiah*, the son ; the same having been devised to him by his father, after the death of his mother. Thus it appears that at the time the defendant entered and committed the alleged trespass there had been for about twenty five years an uninterrupted claim and exclusive possession by the plaintiff and the widow of the testator, both claiming under the will, and adversely to all other persons. On this view of the subject, we are not aware of any legal principles on

which the defendant could justify his entry in 1825, even if he was the legal owner of the land at the time. On this ground the defence fails; and here we might close our opinion; but as it may be satisfactory and useful to the parties to have the decision of the Court upon the question of title, we shall proceed to the examination of it, as disclosed in the report, and the resolve of *March* 8, 1804, which is referred to in it.

It is a part of our history that before and during the war of our revolution, multitudes of persons settled upon the public lands in Maine, which then belonged to Massachusetts, and in various parts made extensive improvements; that they became the subjects of legislative consideration and care, and were by successive Legislatures treated as having a species of equitable title to the lands they had subdued and cultivated, whereby the value of the adjoining or surrounding property had been enhanced; and that at different times provision was made for quieting them in their respective settlements, and on easy terms, conveying to them or their assigns the legal title which was in the Commonwealth. The language of these resolves presupposes the transmission of this possessory and equitable title from one to another. The proceedings of the Legislature in relation to the lands in *Sullivan,* were a part of the general system, and were predicated on the same principles which had been generally adopted.

It appears by the before mentioned resolve that in virtue of a prior one, *David Cobb,* Esq. had been appointed a Commissioner "to repair to the said town of *Sullivan,* and cause a survey of said town to be made at the expense of the petitioners, and to report to the next General Court the number of settlers who are original proprietors, or their heirs or assigns; those who are not original proprietors and settled previous to the first of *January* 1784; and also those who have settled thereon since that period to the present time; and the quantity of land which, in his opinion, shall be confirmed to the several settlers respectively." By the report of the said *Cobb* it appears that *Josiah Simpson* was an original proprietor, and that he assigned to his heirs two hundred acres. The language of the Commissioner in his report relating to the assignment is this: "He

has assigned to each of the original proprietors or to their heirs who settled in the town, and those settlers, their heirs or assigns, who were on the lands prior to the year 1784, and to those who settled thereon since that period to the present time," &c. Here are three classes of persons mentioned. In speaking of the first class, the word "assigns" is not mentioned, though in his commission he was directed to report who were the original proprietors, their heirs or assigns. In speaking of the second class he uses the words, "heirs and assigns," and in speaking of the third class he uses neither of the words; and yet it appears that seven of the last class reported were at that time deceased. These facts show that exactness of description and accuracy in the use of technical language were not particularly considered or attended to by the Commissioner. By an inspection of the report it further appears that no less than ninety settlers are enumerated for whom provision was made, and most of whom were on the lands prior to the year 1784; and where they were deceased, the lands were invariably assigned to the heirs, as stated in the list of such settlers, and described in no other manner; probably no other description or certainty as to the persons beneficially and equitably interested was deemed necessary. But knowing, as we do, the humane intentions of the Legislature, with respect to settlers and their assigns, can it be supposed that it was ever their design or that of the Commissioner, that in all cases where settlers had sold and conveyed their possessory interest to others and received a valuable consideration for it from fair purchasers, or had in any other mode transferred such interest, that the assignments to the living settlers, who had so sold and transferred, or to the heirs of deceased proprietors or settlers, who had so conveyed or devised their title, should in all cases be considered as enuring to the use and benefit of such settlers, or such heirs, to the exclusion of the uncontested claims and rights of fair purchasers, or favored devisees? Is it not much more in harmony with the benevolent intentions of government, as distinctly manifested in other cases of a similar character, to consider the word "heirs" as inserted in the report, by way of defining the interested representatives of the settlers, whether heirs, grantees or devisees? Is not this the most rational con-

struction, when it appears that fifty nine of the ninety settlers had resided on their respective lands more than twenty years, and fifteen more of them nearly ten years before the commissioner executed his commission? Surely it must have been strange indeed, if, during the above periods, numerous changes had not taken place as to the ownership of the lots on which settlements had been made.

But the foregoing questions may be more satisfactorily answered by a particular examination of the resolve, passed on acceptance of the report. The language of it is more explicit than the report, and discovers more attention to the subject, and to the equitable interests of all concerned. It is in these words : " Resolved that the report of *David Cobb*, Esq. and the survey of the town of *Sullivan* by him caused to be made in pursuance of a resolution of this Commonwealth, passed the fourth day of *March* 1803"—(here follows a statement of the powers given to him by that resolution) " be accepted ; and that the quantity of land assigned in said report and survey, to the original proprietors, to the heirs and assigns of original proprietors ; to the settlers, and to the heirs and assigns of settlers, as respectively set against their several names therein, be and hereby is confirmed and granted accordingly." As we have before stated *Josiah Simpson*, the devisor, was an original proprietor, whose heirs or assigns the commissioner was directed to report, but which he did not do ; but the resolve confirms the two hundred acres to the heirs and assigns of *Josiah Simpson*, and the same corrective language is applied to those who became settlers after *January* 1, 1784. The terms of the report, where inaccurate or defective, are corrected by the resolve, or a more enlarged and extended meaning is evidently given to them by it, in conformity to the usual course. In the construction of the resolve, the term " assigns" includes devisees as well as grantees. 4 *Dane*, 550, *sec.* 10. It must be considered as comprehending those who at the time owned and held the equitable title of the settler by any species of legal transfer.

It is true that the deed from the selectmen purports to convey the lands therein described to the heirs of *Josiah Simpson*, and those only ; thus narrowing the language of the resolve, in that part of it which gives to them the authority to convey, which is, that they " are hereby authorized and empowered to acknowledge a receipt thereof" (that is, of the sum required to be paid) " and to release to such person or persons, so paying the same, and to his or their heirs and assigns all the right, title and interest of the Commonwealth in and to the land assigned to said person or persons by this resolve ; which deed, duly recorded in the register's office, shall be good and valid in law to convey to and vest in such person or persons and their heirs and assigns the title of the Commonwealth forever in such lands." In the above quoted passage of the resolve, the word " and" must be construed " or," so as to give to it the intended operation ; that is, if the deceased settler had neither conveyed nor devised his equitable estate to any one, then the grant operated, and a deed should have been given to the heirs ; but if he had in either of the above modes, disposed of such equitable title, then the grant operated to and for the benefit of the grantee or devisee, as the assign of such settler, and the deed should have been given accordingly, so as to do justice to all concerned. Had the terms of the resolve, thus explained and construed, been observed, as to the form of the deed to be given by the selectmen, it would have conveyed the land in question to *Josiah Simpson*, the devisee, as assign of *Josiah Simpson* the testator, instead of the heirs. Such was the mode adopted in the case of the assign of *Asa Dyer*, another settler in *Sullivan*. In the case of *Hill v. Dyer*, 3 *Greenl.* 441, the deed was made by the selectmen to *Hill*, the assignee of said *Dyer ;* they even conveyed it to him by name, not merely as the assignee of *Dyer*. In making all the deeds the selectmen acted under a delegated authority ; and in such cases, the principle of law is well known and established, that the authority must be strictly pursued. If, as we think, nothing passed by the deed to the heirs of *Josiah Simpson*, then the defendant, had no right of entry in 1827, and was a trespasser as charged in the writ, even if the plaintiff's pos-

session had continued only from 1821, when he claimed and possessed in his own right. But though the defendant has no title to the *locus in quo* under the deed, we are inclined to the opinion that as the selectmen were only authorized, but not required to give a deed, no deed is necessary to perfect the title of those to whom the land, assigned to them, was confirmed and granted by the express terms of the resolve, provided the sum each settler was required to pay within two years, was paid within that time. The confirmation and grant were on a condition subsequent; besides, it appears that, in the present case, the condition was performed in about six months after the resolve was passed, by payment of the required sum, the receipt of which is acknowledged in the deed. We are disposed to adopt the above opinion on this point by reason of the following clause in the resolve which is in these words : " But if any of the persons aforesaid shall neglect to pay said sum respectively ordered by this resolution within the time prescribed, the quantity of land granted to such delinquent person or persons shall revert to the Commonwealth." This provision must be considered as predicated on the principle that the title had passed by the resolve confirming and granting the land. For the sake of obtaining a deed, each settler would feel it his interest to pay the sum required of him ; and on this ground the provision might have been useful. This case in the above particular, is not unlike that of *Mayo & al. v. Libby,* 12 *Mass.* 339. In the view we have thus taken of the cause we do not perceive how the proceedings in the Probate Court can have any legal effect on the decision of it. The application to that Court for partition was in *November* 1824, about twenty two years after the adverse possession of the premises was commenced, (which we considered in the beginning of this opinion) and has ever since been continued and under a claim of title, originating under the will in 1802 and the resolve of *March* 1804, almost twenty one years before the application was presented. There being no right of entry, a petition for partition could not be maintained in a court of common law ; and surely the same objection lies in the present case. Besides the plaintiff had no notice and he is not bound by the decree of the Probate

Sargent *v.* Simpson.

Court, on that account, even if it had jurisdiction of the subject matter.

On the whole, we are of opinion that the defence cannot be sustained ; and according to the agreement of the parties the nonsuit must be set aside and a default entered.